IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEAN ELGERT, <br><br> Plaintiff, <br><br> v. <br><br> SIEMENS INDUSTRY, INC., et al., <br><br> Defendants. | CIVIL ACTION <br> NO. 17-1985 |

**OPINION**

**Slomsky, J.**                                                                                            **March 20, 2019**

### I. INTRODUCTION

This is strict liability case involving an allegedly defective product. Plaintiff Sean Elgert was a mechanic at UPS who was severely injured while servicing an LOA-24 machine at his work facility. This machine is an extendable conveyor belt that transports mail at United Parcel Service ("UPS") facilities. On March 23, 2017, he filed his suit in the Court of Common Pleas of Philadelphia County against Defendants Siemens Industry, Inc., Siemens Postal, Parcel & Airport Logistics, LLC, and Dematic Corp., who are the manufacturers of the LOA-24, alleging (1) defective design under Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), and (2) negligence. The case was removed to this Court based on diversity of citizenship jurisdiction.

Before the Court is Defendants Siemens Industry, Inc.'s, Siemens Postal, Parcel & Airport Logistics, LLC's and Dematic Corp.'s (collectively, "Defendants" or "Siemens Dematic") Motion to Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety Communication and Alternative Design Opinions at Trial pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Doc. No. 29.) For the reasons discussed infra, the Motion will be denied.

1

## II. BACKGROUND

Plaintiff Sean Elgert ("Plaintiff" or "Elgert") was a mechanic at the United Parcel Service ("UPS") facility in Horsham, Pennsylvania. (Doc. No. 29-2.) On July 7, 2015, he was servicing a LOA-24 conveyor machine that first was designed by Santa Rosa Systems in 1998. In 2004, Defendants purchased the right to manufacture and distribute this line of conveyors. They manufactured the particular LOA-24 involved in Plaintiff's incident and sold it to UPS. (Id.) The LOA-24 is a conveyor device that has three extendable and retractable sections called booms. (Id. at 3.) When the booms are fully extended, they form a conveyor belt that moves down an inclined ramp to transport pre-sorted packages. For operation and maintenance purposes, the machine can be controlled by the expansion and retraction of the boom sections. (Id.)

In the instant matter, Elgert "locked out" the machine before he began replacing its parts, which means he disengaged all of the electrical energy sources so that the booms would not extend. (Doc. No. 31-1 at 2.) After replacing a part on the left side of the machine, he proceeded to change the corresponding part on the right side. (Id.) He put his left hand on the left side of the machine to maintain stability. (Id.) The machine unexpectedly extended by the force of gravity, despite the fact that it was electronically "locked out." In this regard, when a machine is "locked out" parts of it are holding what is known as stored energy due to its position relative to other objects. Four fingers on Elgert's left hand were crushed by the booms, and later amputated. (Id. at 2-3.)

On March 23, 2017, he sued Defendants in the Court of Common Pleas of Philadelphia County, alleging strict products liability and negligence due to the LOA-24's defective design. (Doc. No. 1 at 13-24.) Plaintiff proceeds on a risk-utility theory of strict liability under the Pennsylvania Supreme Court's decision in Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014). Specifically, Elgert claims that Siemens Dematic is responsible for the defective design of the

LOA-24 in accordance with the factors relevant to the risk-utility analysis set forth in Tincher. The factors are: (1) the usefulness and desirability of the product – its utility to the user and the public as a whole; (2) the safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and (7) the feasibility, on part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. Tincher, 104 A.3d at 398.

In support of his position, Plaintiff retained Thomas Cocchiola, P.E., C.S.P.[1] to render an expert opinion. (Doc. No. 31-1 at 3.) Cocchiola is a well-qualified engineer. He has earned a Bachelor's degree in mechanical engineering from Villanova University, where he was a member of Pi Tau Sigma, an honorary mechanical engineering fraternity.[2] (Doc. No. 31-7 at 2-3.) He also holds a Master's degree in Business Administration. (Id.) Additionally, he is a licensed professional engineer in New Jersey, New York and Pennsylvania. (Id.) He is a board-certified professional, and a member of the American Society of Mechanical Engineers, the National Society of Professional Engineers, the National Academy of Forensic Engineers, and the

---

[1] P.E. stands for "professional engineer." C.S.P. stands for "Certified Safety Professional." (See Doc. No. 31-7 at 2.)

[2] Mechanical engineering is the branch of engineering that involves the design, production and operation of machines.

American Society of Safety Engineers. (Id.) Cocchiola served as an adjunct professor at the New Jersey Institute of Technology until 1999. (Id.) Since 1976, he has worked as a consulting engineer. (Id.)

Cocchiola prepared a written report based on inspections of the Siemens Dematic LOA-24 conveyor involved in the accident, documents produced in discovery regarding the accident, authoritative safety standards and references, and his education, professional training and experience. (Doc. No. 31-2 at 4.)

His opinion has two main conclusions. (Id.) They are: (1) the LOA-24 was defectively designed, and (2) there were feasible alternative designs that could have successfully eliminated the stored energy risk that caused Elgert's injury. (Doc. No. 31-2 at 3-28.) He concludes that Defendants should have equipped the machine with energy isolation devices to prevent the release of stored mechanical energy during maintenance and repair of the LOA-24 in accordance with American National Standard Institute ("ANSI") regulations. (Id. at 16-19.) In particular, Defendants should have provided an energy isolating device to prevent the telescoping boom section from extending due to the force of gravity. (Id.) Additionally, he found that the machine's manual did not include a recommendation for type or location of energy isolating devices to be used to anchor the booms, despite Defendants' awareness of the hazard. (Id.)

> In relevant part, he opined:
>
> The Siemens Dematic LOA-24 was defectively designed because it lacked energy isolation devices for safely securing conveyor boom sections during maintenance and repairs. Energy isolation devices were necessary for securing boom sections during maintenance in accordance with safety standards (ANSI/ASSE Z244.1) and recommendations.
>
> The LOA-24 specifically lacked properly identified integral energy isolation devices (e.g., latch pins, vertically and horizontally stop bars, cross member latches) or non-integral energy isolation devices (e.g., safety blocks, props, clamps,

4

and come-alongs) that would enable workers to prevent boom section movement due to the force of gravity.

Siemens Dematic should have provided energy isolation devices to restrain stored potential energy due to gravity consistent with ANSI/ASSE Z244.1.

The failure of Siemens Dematic to equip the LOA-24 with energy isolation devices unnecessarily exposed workers to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defectively designed because the lockout section in the service manual did not address hazards due to gravity and did not include information and recommendations for energy isolation devices.

The Siemens Dematic lockout section should have specifically addressed hazards due to gravity and included specific energy isolation device recommendations in accordance with ANSI/ASSE Z244.1.

Siemens Dematic failed to provide information and energy isolation device recommendations needed for the development of safe lockout procedures.
The LOA-24 service manual should have included the type of instructions and recommendations for "approved" energy isolation devices that were included in Bulletin #56.

The failure of Siemens Dematic to specifically address gravity-related hazards and to provide energy isolation device recommendations unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defective because it lacked adequate safety warnings in the service manual and on the conveyor. Siemens Dematic should have displayed a mechanical lockout warning addressing gravity (e.g., CEMA waning) in the lockout and base repair sections. Siemens Dematic should also have displayed a lockout warning addressing gravity hazards (e.g., CEMA warning) along with the electrical lockout warning next to the LOA-24 electrical disconnect switch.

The failure of Siemens Dematic to display safety warnings that specifically address the need to restrain gravity related hazards unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

(Doc. No. 31-2 at 22-23.) Cocchiola submitted that a pin system could have been used to prevent boom section movement. (Id.) In his deposition, he stated that the pin should be L-shaped, six inches long, and three-quarter inches in diameter to adequately sustain the weight of the booms.

5

(See Doc. No. 31-3) He said that holes in two spots on corresponding sides of the conveyor could accommodate the pins. (Id. at 6.)

Importantly, Defendants do not challenge Cocchiola's qualifications. (Hr'g Tr. at 5:11-20.) Rather, they challenge the reasonableness of the opinion itself. (Id.)

### III. STANDARD OF REVIEW

Defendants argue that Cocchiola's opinion is inadmissible pursuant to the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In Daubert, the United States Supreme Court provided the analytical framework to determine the admissibility of expert testimony under Federal Rule of Evidence 702. This rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is a product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The threshold issue under a Daubert motion is whether the expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. Daubert, 509 U.S. at 593. The assessment is focused on whether the reasoning or methodology of the expert is scientifically valid and whether it can be applied to the facts at issue. Id.

A trial court acts as a "gatekeeper" and "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Id. at 589. The Third Circuit has interpreted that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification,

reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 369, 404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994)).  It explained:

> Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be reliable; it must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.  In sum, Daubert holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity.  Finally, Rule 702 requires that the expert testimony must fit the issues of the case.  In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.  The Supreme Court explained in Daubert that Rule 702's helpfulness standard requires a valid scientific connection to the pertinent injury as a precondition to admissibility.

Id. (internal marks and citations omitted).

"[T]he Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact.  Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility." Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) (citations omitted).  As the Supreme Court in Daubert stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 595.

The Supreme Court supplied a non-exhaustive list of factors to consider in an analysis under Daubert.  They include whether the theory can be tested, whether it is subject to peer review, whether there is known potential rate of error, and general acceptance in the community. Id. at 594.  These factors are not dispositive.  Id.; see also Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008) (noting that Fed. R. Evid. 702 should be liberally construed).

## IV. ANALYSIS

### A. Warnings and Instructions Testimony

#### 1. Qualification

As noted, the Third Circuit has consistently emphasized a liberal policy of admissibility of evidence under Rule 702, which extends to the formal qualification of experts. Paoli II, 35 F.3d at 741; see also Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). In addition, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise and [has] been satisfied with more generalized qualifications." Paoli II, 35 F.3d at 741. "A broad range of knowledge, skills, and training qualify an expert." Id. The Third Circuit has viewed both substantive and formal qualifications of an expert liberally.

Although they do not dispute his engineering qualifications, Defendants aver that his opinion on warnings or instructions should be inadmissible because his career does not include specialized training in those areas. (Doc. No. 29 at 15-20.) This argument is unpersuasive. Cocchiola's practical engineering experience provides a sufficient basis to qualify his opinion regarding whether Defendants' lack of instructions on anchoring booms contributed to the risk of injury inherent in the LOA-24. Specific training or experience is not necessary.

In Pineda v. Ford Motor Co., the Third Circuit analyzed the district court's decision to preclude a plaintiff's expert from testifying about defendants' failure to provide instructions on how to safely replace liftgate glass and hinges. 520 F.3d 237, 242 (3d Cir. 2008). There, the expert readily admitted that he was not a warning or instructions expert and did not offer any specific alternative language for the instructions. Id. The Court overturned the exclusion of his testimony, explaining that while a qualified expert should possess specialized expertise, the specialization need not be specific. Id. at 244 (citing Schneider ex. rel. Estate of Schneider v. Fried, 320 F.3d 369, 404 (3d Cir. 2003)). It stated, it "would be an abuse of discretion to exclude

8

testimony simply because the trial court does not deem the expert to be the best qualified or have specialization." Id. (citing Holbrook v. Lynes Bros. SS. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

Here, the Siemens Dematic manual begins by explaining the LOA-24 and normal operation of the machine. (Doc. No. 29-7.) Thereafter, it describes common maintenance procedures, such as how to perform maintenance on the boom gear motor drive chains, the task Plaintiff was performing when he was injured. (Id.) It provides instructions on how to perform the maintenance. (Id.) However, the instructions do not include step-by-step instructions on how to lock out the stored energy hazard. (Id.) As in Pineda, Cocchiola here does not seek to propose any specific alternative language for the instructions. Rather, his opinion is limited to whether Defendants lack of instructions exposed UPS mechanics to increased risk of injury. Because of his expertise in engineering, he possesses the requisite broad range of knowledge, skills, and training to opine on the effect of Defendants' lack of instructions in the context of Plaintiff's defective design claim.

Accordingly, Cocchiola's opinion regarding instructions and warnings meets the Daubert qualification standard.

### 2. Reliability

The Third Circuit has interpreted "reliability" to mean that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. Pineda, 520 F.3d at 244 (quoting Paoli, 35 F.3d at 742) (internal quotations omitted). Notably, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness." Paoli, 35 F.3d at 744. Admissibility turns "on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined." Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997).

A district court is directed to the following factors to determine the reliability of proposed expert testimony: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." Schneider v. Fried, 320 F.3d 369, 405 (3d Cir. 2003) (citing Paoli, 35 F.3d at 742 n.8).

It is well-established, however, that these factors "are neither exhaustive nor applicable in every case." Kannankeril, 128 F.3d at 806–07. The Daubert court "made clear that its list of factors was meant to be helpful, not definitive." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). Indeed, some courts have held that when examining expert testimony that is based on practical experience, rather than academic theories, "the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable," because the reliability of testimony from a practical experience expert "depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." United States v. Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000). In Daubert, "the Supreme Court specifically held that [Federal] Rule [of Evidence] 702 overruled the requirement that an opinion must gain general acceptance in order to qualify as admissible expert testimony; instead general acceptance and peer review are only two of the factors that a district court should consider when acting as a gatekeeper." Schneider, 320 F.3d at 406 (citing Daubert, 509 U.S. at 589).

After considering his written report and sworn oral deposition testimony with the requisite level of flexibility, the Court finds that Cocchiola's opinion meets the level of reliability

10

to be admissible. In Pineda, the Third Circuit reinforced that Federal Rule of Evidence 702 requires the district court to maintain flexibility in assessing the admissibility of expert testimony. It stated:

> The District Court's inquiry of the reliability of Clauser's methodology did not demonstrate the level of flexibility required by Rule 702 and our past precedent . . . . Clauser did not have to develop or test alternative warnings to render an opinion that the 2002 service manual did not provide adequate, step-by-step instructions to account for the different stresses that might be exerted when an automobile technician replaces the rear liftgate brackets and hinges, or that the lack of instructions was a safety issue for the technician.

Id.

In this case, Defendants argue that Cocchiola's testimony should be precluded because:

> [Cocchiola] has no understanding of the differences between how ordinary consumers and trained employees perceive risk and warnings that address risk. He did not consult any content within any textbook, treatise or other peer reviewed literature in formulating his on-product warning and product manual opinions. He could not identify any specific literature that would tend to support his on-product warning and product manual opinions. Equally alarming, he performed no studies or testing on any targeted population group relative to his warning and safety communication opinions.

(Doc. No. 29 at 12.) Essentially, Defendants contend that Cocchiola's opinion is not admissible because it does meet the Daubert factors. It has been established, however, that Daubert factors are advisory and not exhaustive. Further, the reliability inquiry must be considered flexibly. See Pineda, 520 F.3d at 244. Here, Cocchiola's opinion is based on his considerable practical experience as a certified engineer, a review of the record and the facts established in this case. He also takes into account the generally accepted principles and practices, including ANSI regulations, the standard governing the LOA-24. (Doc. No. 31-2 at 4.) Even though his opinion does not rely on peer-reviewed literature and generally accepted practices, it is still reliable. He does not have to develop or test alternative warnings to render an opinion that the LOA-24 service manual did not provide adequate step-by-step instructions to account for the dangers to users

11

during a mechanical lockout. Given his practical experience, he also does not have to obtain general acceptance or peer review to provide a reliable opinion.

Accordingly, Cocchiola's expert opinion is reliable in accordance with the second part of the Daubert standard.

### 3. Helpfulness To the Trier of Fact

At trial, a jury would be asked to consider the Tincher risk-utility factors to determine whether Defendants are liable for the defective design of the LOA-24. As discussed above, these factors are: (1) the usefulness and desirability of the product – its utility to the user and the public as a whole; (2) the safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and (7) the feasibility, on part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. Tincher, 104 A.3d at 398.

In the instant matter, Cocchiola's opinion fits the issues of this case. Whether Defendants lack of step-by-step instructions in the LOA-24 service manual is relevant to Elgert's injury is a question of fact that the jury will be presented with at trial. Cocchiola's testimony is particularly helpful to determining whether the existence of suitable instructions could have increased Elgert's anticipated awareness of the dangers inherent in the LOA-24. A factfinder could

conclude that step-by-step instructions on mechanical lockout that would have made the product more desirable to users. Additionally, reasonable jurors could conclude that Defendants' failure to provide instructions made the LOA-24 less safe to users, and that the existence of adequate instructions could have avoided the danger that caused Elgert's injury. Although the cost of providing instructions is unclear, reasonable jurors could find that this cost is outweighed by the probability and seriousness of harm caused by the machine.

For all of the foregoing reasons, Cocchiola's opinion regarding warnings is admissible.

### B. Alternative Design Testimony

#### 1. Qualification[3] and Reliability

As noted previously, the reliability inquiry established in <u>Daubert</u> is whether proposed testimony is based on procedures and science rather than subjective belief or unsupported speculation. Based on his experience in mechanical engineering, a review of depositions, authoritative references, discovery responses, OSHA documents, Cocchiola suggested that "[Defendants] should have equipped the LOA-24 with energy isolation devices to prevent the release of stored mechanical energy during maintenance and repairs in accordance with Sections 4.2 and 4.7 of ANSI/ASSE Z244.1." (Doc. No. 31-2 at 16.) He then suggested three alternative designs. First, he suggested that "[t]he base unit could have been designed with holes in the sides to accommodate pins that can secure cam rollers and prevent boom section movement." (<u>Id.</u>) Second, he reported that "[a] threaded bolt design could have also been used to accomplish the same function. This alternative would enable a worker to tighten the bolt from the side. The tightened bolt would extend in front of the cam roller, to prevent the boom sections from

---

[3] Defendants do not dispute Cocchiola's engineering qualifications to provide an opinion on alternative design.

extending unintentionally. (Id.) Third, he described a design where "[t]he base unit could have been designed and fabricated to accommodate vertically aligned steel members (e.g., channels) to function as stop blocks." (Id. at 15.)

Further, through sworn deposition testimony and a written report, he opined that the pin suggested in his first recommended alternative should be an L-shaped pin that is six inches long and three-quarter inches in diameter to adequately sustain the weight of the booms. (Doc. No. 31-3 at 6-8.) He explained that the holes would be located in two spots on opposite sides of the conveyor. (Id. at 3.) He drew pictures to support his design based on his knowledge of the machine and other similar designs. (Id. at 6-8.) He clarified his design by stating "[t]here's really no alignment that has to be done. . . . [Y]ou would insert the pins and then you could roll out or extend the boom sections that the cam rollers are in contact with the pins or just right next to the pins, and would then prevent the boom section from rolling out any further." (Id. at 10.) Importantly, in his deposition he testified regarding the mathematical calculations for the numbers he offers as follows:

> I think its 3 and one-half degrees. And the weight of the entire piece of equipment is 7500 pounds. So I took the angle of inclination and three-quarters of the 7500 pounds and calculated what the amount of force would be along the track, in other words, what the or for that matter where the C clamp would have to resist. And the calculation I got was a little over 300 pounds.

(Id.) Considering his testimony and report, Cocchiola developed a methodology to determine the alternative designs he offers. He has also provided good grounds for his beliefs in the form of explanations, drawings and mathematical calculations to demonstrate that his opinion is based on scientific facts rather than speculation and subjectivity. Accordingly, Cocchiola's alternative design opinion meets the Daubert qualification and reliability standards.

14

### 2. Helpfulness to the Trier of Fact

Fed. R. of Evid. 702 requires that expert testimony must be relevant for the purposes of the case to assist the trier of fact. Schneider, 320 F.2d at 404. To be admissible, the testimony must have a valid scientific connection to the pertinent injury. Id. Here, Cocchiola's proposed alternative designs would assist the trier of fact in assessing the Tincher factors, especially considering the Court's interpretation of a liberal policy of admissibility under Fed. R. Evid. 702.

Overall, Cocchiola's report and opinion would assist the jury in determining whether the LOA-24 could have been designed in a manner that would make it more useful, desirable and safer to users. Tincher, 104 A.3d at 328. In particular, Cocchiola's testimony and written report provide relevant information on a substitute design to the LOA-24 that would meet the same need without making the machine unsafe. Id. Moreover, it would also shed light on the manufacturer's ability to eliminate the unsafe character of the LOA-24 without impairing its usefulness or making it too expensive to maintain. Id.

## V. CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety Communication and Alternative Design Opinions at Trial (Doc. No. 29) will be denied. An appropriate Order follows.