IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SEAN ELGERT,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>SIEMENS INDUSTRY, INC., et al.,<br><br>　　　　　Defendants. | CIVIL ACTION<br>NO. 17-1985 |

## OPINION

**Slomsky, J.**                                                                    **March 21, 2019**

### I.    INTRODUCTION

This is a strict liability case involving the alleged defective design of a conveyor machine known as the LOA-24.  Plaintiff Sean Elgert was a mechanic employed by the United Parcel Service ("UPS") in Horsham, Pennsylvania.  UPS uses the LOA-24 conveyor to sort packages at its warehouses.  Defendants Siemens Industry, Inc. ("Siemens"), Siemens Postal, Parcel, and Airport Logistics, LLC, and Dematic Corp. ("Dematic") (collectively, "Defendants" or "Siemens Dematic") are the manufacturers, producers and distributers of the machine.

On July 7, 2015, Elgert was severely injured while repairing an LOA-24 conveyor at his facility.  He sued Defendants in the Court of Common Pleas of Philadelphia County, raising two claims: (1) strict liability under § 402A of the Restatement (Second) of Torts, pursuant to <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014), and (2) negligence.  Before the Court is Defendants' Motion for Summary Judgment.  (Doc. No. 28.)  Plaintiff filed an Opposition to the Motion for Summary Judgment (Doc. No. 30-1), and Defendants filed a Reply in Support of their Motion (Doc. No. 34).  The Motion is now ripe for disposition.  For the reasons discussed <u>infra</u>, it will be granted in part and denied in part.

1

## II.    BACKGROUND

### A.  The Model LOA-24 Conveyor Incident

Plaintiff Sean Elgert ("Plaintiff" or "Elgert") was a full-time mechanic at the UPS facility in Horsham, Pennsylvania.  (Doc. No. 1 at 15 ¶ 2.)  His job responsibilities included servicing, repairing and inspecting LOA-24 machines.  (Doc. No. 29-5 at 30:1-2.) The LOA-24 is used exclusively by UPS.  In 1998, UPS collaborated with two manufacturers, Santa Rosa Steel and Caljan Industries, to create the design for the machine.  (Doc. No. 29-10 ¶ 13.)  In 2004, Siemens Dematic purchased the rights to design and manufacture it.  (Id.)  Siemens Dematic sold and designed the particular LOA-24 that was involved in Elgert's incident.  (Id.)  Since 1998, despite the change in manufacturer in 2004, there have been no material changes to the LOA-24 design. (Doc. No. 29-8 at 3; Doc. No. 29-10 at 6 ¶ 13.)  Aside from the incident giving rise to this case, there have been no reported claims, notices or lawsuits regarding the LOA-24.  (Doc. No. 29-14 at 3 ¶ 7.)

The LOA-24 is an intricately designed machine.  Its product manual contains the following description:

> The Model LOA-24 Cantilever Gravity Loader is a fixed-base gravity roller conveyer with three cantilevered, telescoping booms[1]. The conveyor is set at a fixed angle to provide gravity roller transport and accumulation of cartons as they come off the feed conveyor to the destination trailer. At the end of the unit, an articulating belted end (ABE), also known as a "droop snoot", provides a height-adjustable operator interface.
>
> [It] is specifically designed to:
>
> > Carry 50 lb per linear foot of live load, plus 200 lb of load at the end of the ABE.
> >
> > Extend over 40 feet into flat floor trailers.

---

[1]    Each separate extending section is called a boom.  (Doc. No. 29-10 ¶ 8.)

Extend over the roller sections present in flat-floor, drop-frame trailers, with and without shelves.

Provide gravity accumulation of material to the outbound trailer.

Provide automated belt conveyor convenience to the operator loading the packages.

Relieve line pressure and provide lift assist for the operator.

(Doc. No. 29-7 at 15; Doc. No. 30-6 at 9.)

Essentially, while in operation, the machine moves pre-sorted packages down an extended inclined conveyor belt by the force of gravity. The conveyor belt is created by three connecting sections. The three sections telescope, which means they can be extended and retracted. Extensions and retractions of the booms are driven by an electric gearmotor,[2] which operates through a chain drive arrangement. (Id.) Specifically, the gearmotor has a brake and two output shafts,[3] which form the mechanism for extending and retracting conveyer boom sections. (Doc. No. 30-5 at 11.) When the machine is operating, or "energized," torque limiting clutches[4] on the

---

[2]    A gearmotor is a type of electrical motor with various output speeds secured by attached combinations of gears. Gearmotor, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/gearmotor (last visited Mar. 13, 2019).

[3]    An output shaft transmits power from the prime mover to the units or parts of a machine to be operated. Output Shaft, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/output%20shaft (last visited Mar. 13, 2019).

[4]    "Torque" is a measure of how much a force acting on an object causes that object to rotate. What is a Torque?, https://www.physics.uoguelph.ca/tutorials/torque/Q.torque.intro.html (last visited Mar. 13, 2019).

A torque limiter is a part of the machine that protects its other components from damage in the event of a torque overload, so that the amount of torque transmitted from one component to the other does not exceed the pre-set amount. Mach III, How it Works: Mechanical Friction Torque Limiter, http://www.machiii.com/Application/How-Friction-Torque-Limiter-Works.asp (last visited Mar. 13, 2019).

output shafts transmit power to the chains and sprockets[5] that extend and retract the booms sections.  (Id.)   From the control center, a user can extend or retract the booms.  (Id.)  When it is not being used, the machine is "de-energized."  In this state, the electric motor brake automatically activates to prevent booms from extending while the machine is being serviced.  (Id.)  The motor break can be disengaged when the machine is being serviced.[6]  (Id.)

On the day of the incident, Elgert was attempting to replace the right and left clutch pads, which are parts on the torque limiters at the base of a LOA-24 machine.  (Doc. No. 29-4 at 3.)  While doing so, he disengaged all electronic energy sources, thereby locking out the unit.  (Id.)  After replacing the left clutch pad, he moved to the right side of the machine and removed the right boom chain master link.  (Id.)  He did not tighten the bolts on the left side of the machine, causing the unit to drift.  (Doc. No. 29-4 at 7.)  The drive sprocket then rotated suddenly extending the booms, despite the electronic lock out of the machine.  (Doc. No. 30-10 at 6.)  Elgert's left hand was in the path of the booms.   As a result, his long, ring, index and small fingers on his left hand were crushed and severed by the booms.  (Id.)  He was immediately rushed to Thomas Jefferson

---

[5]   A sprocket is a toothed wheel whose teeth engage the links of a chain.  Sprocket, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/sprocket (last visited: Mar. 13, 2019).

[6]   UPS refers to the process of securing the LOA-24 boom sections as a "mechanical lockout." The purpose of this procedure is to protect the user of the machine from the release of stored energy during maintenance. (See Doc. No. 29-7; Doc. No. 30-6.)   Stored energy is a gravity potential that accumulates when the machine is situated in a way that some parts are farther away from others.  (Doc. No. 30-7 at 6:10-19.)  With respect to the LOA-24, it presents a particular hazard because this gravity potential could cause the booms to extend on their own without an operator.  (Id.)  When the LOA-24 is mechanically locked out, the user is preventing a hazard from happening by anchoring the booms.  Methods of mechanical lockout differ at UPS facilities.  (Doc. No. 30-7 at 65:4-14.)

At the beginning of their employment, plant engineer mechanics are trained by UPS on how to perform mechanical lockout on the LOA-24. During an orientation period, mechanics shadow experienced mechanics in the field for several days.  (Doc. No. 29-10 ¶ 15.)

University Hospital and underwent surgery on his left hand.  (Doc. No. 30-4 at 2.)  His four injured fingers were amputated.  (Id.)  Elgert has no recollection of the incident, and there were no witnesses.  (Doc. No. 29-5 at 84:2-3.)

The LOA-24 manual contains information regarding the operation and maintenance of the machine.  (Doc. No. 29-7 at 1-19; Doc. No. 30-6 at 1-14.)  It provides instructions on how to operate and maintain the machine, and general safety warnings.  (Id.)  In relevant part, the manual warns users to anchor the conveyer booms during maintenance and explains that the unit booms will telescope if not anchored.  (Id.)  It also warns users not to perform maintenance until all gravity energy sources have been locked out.  (Id.)

Specifically, it states:

The primary purpose for a lockout/tagout procedure is to protect workers from injury caused by the unexpected energization or start-up of equipment.

The standard from the Occupational Safety and Health Administration (OSHA) centers on the control of potentially hazardous energy. The rule requires that energy sources for equipment be turned off or disconnected, and that the switches be locked or labeled with a warning tag. This ensures that the equipment has been shut down for servicing or maintenance and will not reactivate while employees are working on it. The regulation defines servicing and maintenance as covering "lubrication, cleaning and unjamming of machines or equipment . . . where the employee may be exposed to the unexpected energization or start up [sic] of the equipment . . . among other things.

We are bringing this to your attention in the event you are not aware of the standard. We urge you to review the applicability and requirements of the standard with respect to your facilities. The lockout/tagout procedure is considered to be just one element of the control procedures for hazardous energy. The employer is responsible for providing procedures that include de-energization of equipment, isolation of energy sources, verification that equipment has been de-energized, and complete diffusion of stored energy.

The standard requires an ongoing program of control procedures and employee training by the employer (regardless of training provided by the equipment vendor at the time of sale) to ensure that the purpose and functions of energy controls are understood and applied. For further information regarding lockout/tagout requirements, refer to the Federal Register, Volume 54, No. 169 published

September 1, 1989. The referenced standard may be found at 29 CFR Part 1910, Section 1910.147. Also copies may be requested from Siemens Dematic's Product Safety Department.

(Doc. No. 29-7 at 12; Doc. No. 30-6 at 6.)

The manual contains the following warning:

> Do not perform adjustments, maintenance, or other work on this equipment without following OSHA lock-out/tag-out requirements and estate and local requirements. Failure to follow these requirements may result in serious injury and/or equipment damage.

> Anchor the unit booms before starting the removal procedure. Once the boom chain master link is disconnected, gravity will move the unit booms if they are not anchored.

(Doc. No. 29-7 at 18; Doc. No. 30-6 at 11.)

No instructions are in the manual issued by Siemens Dematic on how to mechanically lockout or anchor the machine. According to a Siemens Dematic representative, Christopher Schikevitz ("Schikevitz"), the company provided an in-person informal training on basic maintenance, including mechanical lockout in 2008. (Doc. No. 30-7 at 14:23-25; 15:3-5.) Aside from this training session, Siemens Dematic did not offer any other training or written materials to UPS mechanics during their employment on how to lockout and maintain the LOA-24. Newly hired mechanics learn UPS's internal lockout methods during their orientation training, when they shadow an experienced engineer.[7] (Doc. No. 29-14 at 50:13-24; 51:1-7.)

---

[7] UPS also has not issued specific written materials regarding the process. (Doc. No. 29-15 at 4; id. at 66:7-12; see also Doc. No. 30-7 at 16:16-21.) After beginning his position as a mechanic engineer in 2013, Elgert's training included one week of educational training in an office setting with UPS supervisor, Ernest Strother, where he reviewed materials, answered questions and took quizzes on a computer. (Doc. No. 29-5 at 31:15-20; 33:4-11.) Then, he underwent a second week of training in the field where he shadowed an experienced mechanic and watched him perform several day-to-day activities on the job. (Id. at 31:15-24.)

**B.  Safety Standards and Regulations**

The nationally recognized industry design standard for conveyers is the American National Standards Institute ("ANSI") B20.1 Safety Standard for Conveyers and Related Equipment.  (Doc. No. 29-6 at 8, 26-32; Doc. No. 29-10 at 2.)  ANSI applies to the design, construction, installation, maintenance, inspection and operation of conveyors and conveying systems in relation to hazards.  (Id.)  The Occupational Safety and Health Administration ("OSHA") requires employers like UPS to provide their employees with detailed written procedures for the control of hazardous energy during servicing or maintenance activities on conveyer equipment.  See 29 C.F.R § 1910.147(c)(4)(ii)(C).  OSHA also requires employers to provide specific lockout instructions for each piece of conveyer equipment within an employer's facility.  (Doc. No. 29-10 at 3 ¶ 5.)  Moreover, ANSI requires an employer's lockout procedures for conveyer equipment to include specific procedural steps for shutting down, isolating, blocking, securing and relieving stored or residual energy.  (Id.)   The procedures set forth in ANSI are consistent with OSHA requirements and procedures.  (Id.)  UPS training procedures are not reduced to writing as required by OSHA and ANSI[8].  (Doc. No. 29-5 at 15-19; Doc. No. 29-15 at 66:7-12.)

In his deposition, Elgert testified that he performed maintenance on the LOA-24 about fifty times before the incident.  (Doc. No. 29-5 at 68:2-9.)  The maintenance included greasing, repairing electrical problems, and replacing parts.  (Doc. No. 29-5 at 69:1-2.)   He also did clutch pad maintenance on the LOA-4 about ten times previously.  (Doc. No. 29-5 at 69:1-24.)

---

[8]    After the incident, OSHA conducted an investigation and cited UPS for violating OSHA 29 C.F.R § 1910.147.  (Doc. No. 29-17 at 2-4.)  OSHA found that UPS' energy control program did not clearly and specifically outline steps necessary for the mitigation of stored kinetic energy on the LOA-24.  (Id.)  It also found that UPS failed to meet its duty of providing employees with written instructions on the performance of a mechanical lockout on the LOA-24.  (Id.)

This was the work he was doing at the time of the incident.

Elgert does not recall learning how to mechanically lockout the LOA-24 during his training at the beginning of his employment at UPS in 2013. (Doc. No. 29-5 at 29:22-24; 41:15-23; 65:2-24) He had not been trained to secure the unit booms from gravity potential when performing a clutch pad replacement. (Doc. No. 29-5 at 65:2-7.) Although he had access to a product manual that was available in the UPS maintenance office, Elgert never read it. (Doc. No. 29-5 at 42:11-24.) But as noted earlier, the manual has no instructions on how to manually lockout the LOA-24.

Ernest Strother, a UPS maintenance mechanic supervisor, stated in his deposition that he recalled training Elgert on gravitational lockout, but his testimony is unclear as to whether this training related to the LOA-24 unit. (Doc. No. 29-14 at 52:1-24.) Elgert's incident is the only reported claim, notice or lawsuit alleging a defect in the LOA-24. (Doc. No. 28 at 6.)

### C. Expert Testimony

Both Plaintiff and Defendants have offered testimony and written opinions from expert witnesses.

#### 1. Thomas Cocchioloa, P.E., C.S.P. [9]

In support of his claim, Plaintiff retained Thomas Cocchiola, P.E., C.S.P. to render an expert opinion. (Doc. No. 31-1 at 3.) Cocchiola earned a Bachelor's degree in mechanical engineering from Villanova University, where he was a member of Pi Tau Sigma, an honorary mechanical engineering fraternity.[10] (Doc. No. 31-7 at 2-3.) He also holds a Master's Degree in Business Administration. (Id.) Additionally, he is a licensed professional engineer in New

---

[9] P.E. stands for "professional engineer." C.S.P. stands for "Certified Safety Professional." (See Doc. No. 31-7 at 2.)

[10] Mechanical engineering is the branch of engineering that involves the design, production and operation of machines.

Jersey, New York and Pennsylvania. (Id.) He is a board-certified professional, and a member of the American Society of Mechanical Engineers, the National Society of Professional Engineers, the National Academy of Forensic Engineers, and the American Society of Safety Engineers. (Id.) Cocchiola had served as an adjunct professor at the New Jersey Institute of Technology until 1999. (Id.) Since 1976, he has worked as consulting engineer. (Id.)

Cocchiola prepared a written report based on inspections of the Siemens Dematic LOA-24 conveyor involved in the accident, documents produced in discovery regarding the accident, authoritative safety standards and references, and his education, professional training and experience. (Doc. No. 31-2 at 4.)

His opinion has two main conclusions. (Id.) They are: (1) the LOA-24 was defectively designed, and (2) there were feasible alternative designs that could have successfully eliminated the stored energy risk that caused Elgert's injury. (Doc. No. 31-2 at 3-28.) He opines that Defendants should have equipped the machine with energy isolation devices to prevent the release of stored mechanical energy during maintenance and repair of the LOA-24 in accordance with ANSI regulations. (Id. at 16-19.) In particular, Defendants should have provided an energy isolating device to prevent the telescoping boom section from extending due to the force of gravity. (Id.) Additionally, he found that the machine's manual did not include a recommendation for type or location of energy isolating devices to be used to anchor the booms, despite Defendants' awareness of the hazard. (Id.)

In relevant part, he opined:

The Siemens Dematic LOA-24 was defectively designed because it lacked energy isolation devices for safely securing conveyor boom sections during maintenance and repairs. Energy isolation devices were necessary for securing boom sections during maintenance in accordance with safety standards (ANSI/ASSE Z244.1) and recommendations.

The LOA-24 specifically lacked properly identified integral energy isolation devices (e.g., latch pins, vertically and horizontally stop bars, cross member latches) or non-integral energy isolation devices (e.g., safety blocks, props, clamps, and come-alongs[11]) that would enable workers to prevent boom section movement due to the force of gravity.

Siemens Dematic should have provided energy isolation devices to restrain stored potential energy due to gravity consistent with ANSI/ASSE Z244.1.

The failure of Siemens Dematic to equip the LOA-24 with energy isolation devices unnecessarily exposed workers to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defectively designed because the lockout section in the service manual did not address hazards due to gravity and did not include information and recommendations for energy isolation devices.

The Siemens Dematic lockout section should have specifically addressed hazards due to gravity and included specific energy isolation device recommendations in accordance with ANSI/ASSE Z244.1.

Siemens Dematic failed to provide information and energy isolation device recommendations needed for the development of safe lockout procedures.

The LOA-24 service manual should have included the type of instructions and recommendations for "approved" energy isolation devices that were included in Bulletin #56.

The failure of Siemens Dematic to specifically address gravity-related hazards and to provide energy isolation device recommendations unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defective because it lacked adequate safety warnings in the service manual and on the conveyor. Siemens Dematic should have displayed a mechanical lockout warning addressing gravity (e.g., CEMA[12] warning) in the lockout and base repair sections. Siemens Dematic should also

---

[11]  A come-along is a hand-operated tool used to pull objects.

[12]  "CEMA" stands for Conveyor Equipment Manufacturer Association. This trade association includes companies that represent the leading designers, manufacturers, and installers of conveyors, conveyor components, and material handling systems. They create voluntary standards, safety, manufacture, and applications to promote growth in the industry. ANSI Webstore, CEMA: Conveyor Equipment Manufacturers Association, https://webstore.ansi.org/sdo/cema (last visited: Mar. 20, 2019).

have displayed a lockout warning addressing gravity hazards (e.g., CEMA warning) along with the electrical lockout warning next to the LOA-24 electrical disconnect switch.

The failure of Siemens Dematic to display safety warnings that specifically address the need to restrain gravity related hazards unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

(Doc. No. 31-2 at 22-23.) Cocchiola submitted that a pin system could have been used to prevent boom section movement. (Id.) In his deposition, he stated that the pin should be L-shaped, six inches long, and three-quarter inches in diameter to adequately sustain the weight of the booms. (See Doc. No. 31-3.) He said that holes in two spots on corresponding sides of the conveyor could accommodate the pins. (Id. at 6.)

## 2. Frank Schwalje, P.E., C.S.P.

Defendants retained as their expert Frank Schwalje, P.E., C.S.P., a licensed professional engineer who specializes in mechanical engineering. (Doc. No. 29-10 ¶ 2.) For over three decades, he has specialized in investigating workplace injuries. (Id.) His expertise specifically includes testing and evaluating mechanical products to determine whether they perform in accordance with the manufacturer's specification and in compliance with the relevant safety standards. (Id.) He has worked as a consultant for industrial conveyor manufacturers regarding the design and development of industrial conveyor products. (Id. ¶ 3.)

Schwalje prepared a report based on inspections of the Siemens Dematic LOA-24 conveyor involved in the accident, documents produced in discovery regarding the accident, authoritative safety standards and references, and his education, professional training and experience. (Doc. No. 29-6.) In relevant part, he concluded:

The injuries sustained by [Elgert] were not caused by any defect or deficiency in the design or manufacture of the Siemens Dematic, Model LOA-24 extendable boom, gravitational conveyor. This conveyor contained all necessary features for its intended use.

[Cocchiola] acknowledged that plaintiff failed to secure the left side clutch assembly bolts before working on the right side. UPS personnel, through their investigation, concluded that the plaintiff also failed to restrain the boom by any of the methods at his disposal. [Elgert]'s injuries resulted from his failure to restrain the booms from extending while he was performing remedial measures to the clutch pads.

Contrary to [Cocchiola]'s opinion, . . . Siemens Dematic did perform a hazard analysis of this product. There are numerous references throughout the Siemens Service Manual that support this conclusion, including one specific to this matter that acknowledges the presence of a potential hazard associated with gravitational extension of the boom resulting from the removal of the drive chain from the motor drive assembly. The warning that is contained within the manual establishes a conscious effort by Siemens to evaluate this potential hazard. Siemens recognized the risk in the warning and how to avoid the risk.

This conveyor was provided with multiple methods of preventing movement of the boom sections due to gravitational forces, including a redundant braking system that prevents the movement of the conveyor boom sections whenever the drive motor is deenergized. When the braking system is rendered inoperable due to repairs being performed on the system, there exists a way to eliminate the gravitational energy of the boom sections by simply fully extending the boom sections. Alternative methods to restrain the potential motion of the boom sections through the use of ordinary tools were in place at this and other UPS facilities. Accordingly, the writer disagrees with plaintiff's expert's allegation that the conveyor lacked the necessary energy isolation devices.

It is the writer's opinion that the energy isolation devices provided by the manufacturer through design, and the training provided to UPS, complied with the requirements of ANSI . . . .

UPS workers were not unnecessarily exposed to the risk of injury as alleged by [Cocchiola]. The Model LOA-24 conveyor has been in service for approximately 23 years, during which time this accident is the only known serious injury sustained by an employee on the more than 1,450 LOA-24 conveyors in service.

· · ·

The equipment was provided with the means of deenergizing both electrical and gravitational energy in a simple and efficient manner, thereby eliminating the potential danger to personnel maintaining or repairing this equipment. By following established lockout procedures, as mandated by codes and standards required of the employer and employee, this equipment could easily be placed into a zero-energy state as necessary for performing certain repairs or maintenance tasks, as detailed in this report. When these established procedures are followed, the stored energy posed no danger to maintenance personnel.

(Id. at 24-25.)

### D. Procedural History

On March 23, 2017, Plaintiff sued Siemens Applied Automation, Inc., Siemens Corp., Siemens Industry, Inc., Siemens Postal, Parcel, and Airport Logistics, LLC, Siemens AG, Siemens Dematic Electronics Assembly Systems, Inc., and Dematic Corp. in the Court of Common Pleas of Philadelphia County, raising two claims: (1) strict liability under § 402A of the Restatement (Second) of Torts, and (2) negligence. (Doc. No. 1 at 14-24.) He sought damages for rehabilitation and medical expenses. On May 1, 2017, the case was removed to this Court based on diversity of citizenship jurisdiction.[13] On September 26, 2017, Defendants Siemens Corporation, Siemens AG, Siemens Applied Automation, Inc. and Siemens Dematic Electronics Assembly Systems, Inc. were dismissed as Defendants by stipulation. (Doc. No. 23.) On August 1, 2018, the remaining Defendants, Siemens Industry, Inc., Siemens Postal, Parcel, and Airport Logistics, LLC, and Dematic Corp. filed a Motion for Summary Judgment (Doc. No. 28), and a Motion to Preclude Plaintiff's Expert Thomas Cocchiola from Offering Any Warning, Safety Communication and Alternative Design Opinions at Trial (Doc. No. 29). Plaintiff opposed both Motions.[14] (Doc. Nos. 30, 31). On September 5, 2018, a hearing on both Motions was held. In an Opinion and

---

[13] Defendants removed this case pursuant to 28 U.S.C. § 1332(a)(1), which provides:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

[14] Defendants also moved for summary judgment on the negligence claim in Count II of the Complaint. On August 15, 2018, Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment. (Doc. No. 30-1.) In his Opposition, he did not respond to Defendants' argument on the negligence claim. As a result, Defendants contend that Plaintiff withdrew his negligence claim. According to the docket, however, the parties have not stipulated to the withdrawal of this claim. Therefore, the Court does not consider Count II of the Complaint to be withdrawn and therefore will address in this Opinion whether summary judgment should be granted on the negligence claim.

Order, dated March 20, 2019, the Court denied Defendants' Motion to Preclude Plaintiff's Expert Testimony. (Doc. Nos. 47, 48.)

Before the Court is Defendants' Motion for Summary Judgment on both counts of the Complaint (Doc. No. 28), Plaintiff's Response in Opposition (Doc. No. 30), and Defendant's Reply (Doc. No. 36). For reasons discussed <u>infra</u>, Defendants' Motion for Summary Judgment (Doc. No. 28) will be granted in part and denied in part.

### III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to judgment as a matter of law." <u>Macfarlan v. Ivy Hill SNF, LLC</u>, 675 F.3d 266, 271 (3d Cir. 2012) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the non-moving party. <u>Kaucher v. County of Bucks</u>, 455 F.3d 418, 423 (3d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. <u>Doe v. Luzerne County</u>, 660 F.3d 169, 175 (3d Cir. 2011) (citing <u>Gray v. York Papers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. <u>Anderson</u>, 477 U.S. at 247-49.

In deciding a motion for summary judgment, the Court must view the evidence and all reasonable inferences from the evidence in the light most favorable to the non-moving party. <u>Macfarlan</u>, 675 F.3d at 271; <u>Bouriez v. Carnegie Mellon Univ.</u>, 585 F.3d 765, 770 (3d Cir. 2009).

Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party. <u>Anderson</u>, 477 U.S. at 255. If there is no factual issue and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. <u>Id.</u> at 250.

## IV.    ANALYSIS

Defendants move for summary judgment on the strict liability claim pursuant to <u>Tincher v. Omega Flex, Inc.</u>, 104 A.3d 328 (Pa. 2014), the leading products liability decision that articulates the test for determining whether a product is "defective" and when, as in this case, a supplier of the product is strictly liability for injuries caused by the defect.[15] In <u>Tincher</u>, the Pennsylvania Supreme Court adopted a framework for strict products liability cases based on the Restatement (Second) of Torts. <u>Id.</u> It ruled that to establish a prima facie warning, design or manufacturing defect claim under Pennsylvania law, a plaintiff must show (1) the product was defective, (2) the defect existed when the product left the seller's hands, and (3) that the defect caused the plaintiff's harm. <u>Id.</u> at 335. Simply put, under the facts of this case, the relevant inquiry is whether the defective design of the LOA-24 caused Elgert's injury.

A plaintiff may prove a "defective condition" exists by showing either "(1) the danger is unknowable and unacceptable to the average or ordinary consumer" (the "consumer expectations standard"), or "(2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions" (the "risk-utility standard"). <u>Id.</u> at 335, 387, 389. Both frameworks involve analysis for the finder of fact and

---

[15]    Because the Court's jurisdiction over this case is based on diversity of citizenship between the parties, the Court will apply the substantive law of Pennsylvania. <u>Chin v. Chrysler LLC</u>, 538 F.3d 272, 278 (3d Cir. 2008).

should only be removed from the jury's consideration where it is clear that reasonable minds could not differ on the issue. Id. at 335.

Plaintiff does not argue that the "consumer expectations" standard applies here. Rather, he relies on the "risk-utility" standard. Defendants contend that Plaintiff's design defect claim fails under this standard. (Doc. No. 28 at 2.) In response, Plaintiff asserts that summary judgment should be denied because he has provided sufficient evidence to show that the LOA-24 is defective under the risk-utility theory.

## A. Summary Judgment Will Be Denied On Plaintiff's Strict Liability Claim Because There Are Genuine Disputes of Material Fact Under the Risk-Utility Standard

The risk utility standard involves a cost-benefit analysis. See Tincher, 104 A.3d at 389. This standard provides that a product is defective if a reasonable person would find that "the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions." Id. The court in Tincher stated that this standard "offers courts an opportunity to analyze post hoc whether a manufacturer's conduct in manufacturing or designing a product was reasonable." Id. "The difficulty in presenting the issue to the jury . . . is resolved by reference to Judge Learned Hand's formula, which 'succinctly captures the common-sense idea that products are unacceptably dangerous if they contain dangers that might cost-effectively (and practicably) be removed.'" Id. at 390.

The risk-utility standard is evaluated under the following factors:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

 (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

 (5) The user's ability to avoid danger by the exercise of care in the use of the product.

 (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

 (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

Id. at 398-99.

 Pennsylvania courts have consistently held that questions arising under the risk-utility analysis should be reserved for a jury. See, e.g., DeJesus v. Knight Indus. & Assocs., No. 10-7434, 2016 U.S. Dist. LEXIS 121697, at *28 (E.D. Pa. Sept. 8, 2016) (denying summary judgment based on the risk-utility evaluation of a chain and rack lift table because there were issues of fact as to whether the probability and seriousness of harm caused by a lift table outweighed the burden and cost of installing alarms); Mercurio v. Louisville Ladder, Inc., No. 16-cv-412, 2018 U.S. Dist. LEXIS 92111 (M.D. Pa. May 31, 2018) (holding that summary judgment was not appropriate because any question of fact should be reserved for the jury, including the factors for a risk-utility analysis); Nathan v. Techtonic Indus. N. Am., 92 F. Supp. 3d 264, 279 (M.D. Pa. Feb. 17, 2015) (denying summary judgment with regard to a table saw's safety features and finding that the determination of whether the risk of harm of a product outweighed the cost of implementing other technology was properly suited for a jury).

 Similarly here, several genuine issues of material fact arise under the risk-utility factors. First and foremost, there is a genuine dispute of material fact on the safety aspect of the LOA-24. Tincher, 104 A.3d at 398. Both Plaintiff and Defendants rely on expert witnesses and their opinions on whether an alternative design would make the LOA-24 more safe. Plaintiff's expert, Thomas

Cocchiola, has proposed alternative designs, such as the use of pins and other items, that would guard against the hazard of the release of stored energy that caused the incident. Defendants' expert, Frank Schwalje has disputed Cocchiola's proposals.

Initially, summary judgment is inappropriate where the opinions and credibility of experts are in dispute. When ruling on a motion for summary judgment, "a district court may not make credibility determinations or engage in the weighing of any evidence." Paladino v. Newsome, 885 F.3d 203, 209-10 (3d Cir. 2018) (citations omitted). Instead, "the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in its favor." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

As discussed earlier, after conducting an investigation of the incident and reviewing the record, Cocchiola concluded that the LOA-24 was defectively designed and that there were feasible alternatives that could have eliminated the stored energy risk, thereby making the product safer.

Specifically, he stated the following in his report, in addition to his opinions noted supra:

For safety purposes, Siemens Dematic should have equipped the LOA-24 with energy isolation devices to prevent the release of stored mechanical energy during maintenance and repairs in accordance with Sections 4.2 & 4.7 of ANSI/ASSE Z244.1. In particular, Siemens Dematic should have provided an energy isolating device to prevent the telescoping boom sections from extending due to the force of gravity.

A number of alternative energy isolating devices could have been incorporated into the original design of the LOA-24 to secure the telescoping boom sections and prevent inadvertent movement during maintenance and repairs. For example,

The base unit could have been designed with holes in the sides to accommodate pins that can secure cam rollers and prevent boom section movement. This design alternative would enable workers to insert pins without removing barrier grounds from the bottom of the conveyer. A pin inserted through the base section would extend in front of a cam roller to prevent the boom section from extending unintentionally.

A threaded bolt design could also have been used to accomplish the same function. This alternative would enable a worker to tighten a bolt from the side. The tightened bolt would extend in front of the cam roller, to [sic] would prevent the boom section from extending unintentionally.

An energy isolating pin or bolt would prevent the cam rollers from rolling, and prevent the conveyer boom sections from extending, in the same basic manner as the C-clamp or block . . .

During his deposition, Mr. Schikevtiz[16] suggested that a mechanical lockout pin type design was subsequently considered for a similar Siemens Dematic conveyor approximately 8-years after the LOA-24 was designed and manufactured. Mr. Schikevitz estimated the cost of the lockout pin was approximately $15-$20.

Mr. Schikevitz suggested a lockout pin would have weakened the LOA-24 based on discussions that reportedly occurred during work on the other similar conveyor. However, he acknowledged this suggestion is not based on an engineering analysis.

[Cocchiola] disagrees with the suggestion that a lockout pin would have weakened the LOA 24 [sic] and caused problems based on the type of loading conditions. The telescoping conveyor sections cantilever out from the base unit, which anchored to the floor. The cantilever loads exerted by the telescoping sections place the top of the base unit in tension and the bottom in compression.

A hole in the side of the base unit at the level of the cam roller would not significantly weaken the base unit and cause a structural failure, especially because fabricated channels on the bottom of the base unit provide additional strength and stiffness. Furthermore, it would have been easy and inexpensive to weld a stiffener plate around the holes, if necessary.

The base unit could have been designed and fabricated to accommodate vertically aligned steel members (e.g., channels) to function as stop blocks. This design would enable a worker to slide a stop member down from the top of the cam roller to support arms. As an alternative, the base unit could have been designed to accommodate a horizontally aligned stop member slid in front of the cam roller support arms from the side of the conveyor. A vertically or horizontally aligned stop member would restrain the cam rollers and prevent in the conveyor boom section from moving under the force of gravity, in the same basic manner as the C-clamp or block described by Mr. Schikevitz.

An energy isolation device could also have been used to secure a stationary base unit crossmember to a cross member [sic] on the movable boom section. This

---

[16]  Christopher Schikevitz is a product line's manager at Siemens Dematic.  (Doc. Nos. 29-9, 30-7.)  He provided an affidavit dated July 30, 2018 and testified at a deposition on January 9, 2018.

alternative would enable workers to secure the sections in the same manner as the come-along method described by Mr. Schikevitz.

Non-integral energy isolation devices (e.g., safety blocks, clamps, come-alongs) could also have been provided.

(Doc. No. 30-5 at 16-17; see also Doc. No. 30-7 at 11:3-20.)

Further, in his deposition, Cocchiola specified that the pin discussed in his report, should be an L-shaped pin, six inches long and three-quarter inches in diameter to adequately sustain the weight of the booms. (Doc. No. 30-9 at 3:4-17.) Michael Martin, a contract equipment manager at UPS, agreed that the insertion of a pin would "prevent the booms from rolling out completely all together." (Doc. No. 30-10 at 4:8-14.) Additionally, Christopher Schikevitz admitted in his deposition that a mechanical lockout pin was contemplated for the design of the LOA-53, a subsequent conveyor to the LOA-24. (Doc. No. 30-7 at 11:10-25.)

By contrast, Defendants' expert, Frank Schwalje disagreed. In summary, he opined:

The injuries sustained by Mr. Elgert were not caused by any defect or deficiency in the design or manufacture of the Siemens Dematic, Model LOA-24 extendable boom, gravitational conveyor. This conveyor contained all the necessary features for its intended use. [17]

(Doc. No. 29-6 at 24.)

Cocchiola's opinion conflicts with Schwalje's opinion. Reasonable jurors could believe either expert's testimony at trial. Consequently, the dispute between the experts is not appropriate for resolution at the summary judgment stage. Nathan v. Techtronic Indus., N. Am., 92 F. Supp. 3d 264, 273 (M.D. Pa. 2015) (citing Hoffman v. Paper Converting Mach. Co., 694 F. Supp. 2d 359, 365-366 (E.D. Pa. 2010) (explaining that conflicting expert opinions on the feasibility of alternative design was not susceptible of resolution at the summary judgment stage).

---

[17] A complete statement of Schwalje's conclusions is in the Background section, supra.

In addition, the evidence offered on summary judgment raises a disputed issue of fact as to whether the probability and seriousness of harm outweighs the burden and cost of installing a lockout system to anchor the booms.

> [Cocchiola] disagrees with [Schwalje's] suggestion that a lockout pin would have weakened the LOA 24 [sic] and caused problems based on the type of loading conditions. The telescoping conveyor sections cantilever out from the base unit, which anchored to the floor. The cantilever loads exerted by the telescoping sections place the top of the base unit in tension and the bottom in compression.

(Doc. No. 30-5 at 16.) This conflicting testimony raises another genuine issue of material fact as to Siemens Dematic's ability to eliminate the unsafe character of the LOA-24 without impairing its usefulness or making it too expensive to maintain its utility. Tincher, 104 A.3d at 398.

Furthermore, it is also disputed whether Plaintiff would have exercised due care by being alert to warnings and following suitable instructions. Tincher, 104 A.3d at 398. Defendants warned against the inherent danger of the LOA-24 in the service manual. (Doc. Nos. 29-7; 30-6.) However, they provided no instructions, training or written materials on how to anchor the booms to mechanically lockout the machine. (Id.) As noted, Siemens Dematic has issued no instructions in the manual on how to mechanically lockout or anchor the machine. According to a Siemens Dematic representative, Christopher Schikevitz ("Schikevitz"), the company provided an in-person informal training on basic maintenance, including mechanical lockout in 2008. (Doc. No. 30-7 at 14:23-25; 15:3-5.) Aside from this training session, Siemens Dematic did not offer any other training or written materials to UPS mechanics during their employment on how to lockout and maintain the LOA-24. As a newly hired mechanic, Elgert learned UPS's internal lockout methods during his orientation training.

For their part, Defendants offer evidence in Frank Schwalje's affidavit that this case is the only reported claim, notice or lawsuit alleging that a product defect in the LOA-24 resulted in

personal injury.  (Doc. No. 29-10 ¶ 7.)  He explains that the product has been used in UPS facilities

nationwide for over twenty years, and over 1,450 units have been distributed.  (Id.)  Defendants

therefore submit that Elgert's anomalous injury could have been avoided if he looked at the service

manual available at his UPS facility, which he admits that he never did.   Further, Defendants

produced the UPS accident report, which indicates that the root cause of Elgert's injury was that

"unit booms were not anchored or come-alonged in place in order to prevent gravity from moving

the unit," and "he did not tighten the clutch pad on the left side after replacement."  (Doc. No. 29-

4 at 7.)  Additionally, UPS mechanic Ernest Strother testified at his sworn oral deposition that in

a discussion with Elgert about the incident, Elgert stated that he "messed up."  (Doc. No. 29-14 at

163:7-20.)  Accordingly, Defendants argue that the injury was caused solely by Elgert's actions,

and not the defective design of the LOA-24, a position disputed by Cocchiola, Plaintiff's expert

engineer.

Viewing all of the evidence in the light most favorable to Plaintiff, there are genuine issues

of material fact as to whether the LOA-24 had a design defect and whether Elgert could have

exercised due care to prevent his injury by reading the service manual available to him.  Moreover,

there is also a genuine issue of material fact as to whether the accident could have been avoided if

Defendants had provided suitable instructions that were specific on how to mechanically lockout

the machine.  These questions require credibility determinations, and more than one conclusion

can arise from the evidence presented.  For these reasons, summary judgment in favor of

Defendants is not warranted on this claim.

**B.  Summary Judgment Will Be Granted On Plaintiff's Negligence Claim in Count II**

Elgert initially made two claims in his Complaint: (1) strict liability due to the defective

design and (2) negligence.  (Doc. No. 1 at 13-24.)  As noted previously, in his Response in

Opposition to Defendants' Motion for Summary Judgment (Doc. No. 31-1), he did not address the negligence claim. In their Reply, Defendants contend that they are entitled to summary judgment on the negligence claim in Count II because Plaintiff effectively "abandoned" it by not addressing it. (Doc. No. 34 at 2.) The docket, however, does not contain any indication that Count II of the Complaint has been dropped from the case. For the reasons discussed <u>infra</u>, however, the Court will grant summary judgment on the negligence claim.

Elgert asserts that Siemens Dematic is both strictly liable and liable for negligence in failing to warn him of the dangers of the LOA-24. (<u>See</u> Doc. No. 1 at 13-24.) In relevant part, he argues that Defendants were negligent for:

> failing to have adequate warnings on the product;
>
> failing to provide proper and adequate warnings to plaintiff's employer;
>
> failing to provide proper and adequate warnings to ultimate users of the product;
>
> failing to warn the ultimate users of the conveyor system with respect to the dangers of said product and how to use the product safely to avoid injury[.] [18]

(Doc. No. 1 at 21.)

In <u>Mazur v. Merck & Co.</u>, the Third Circuit explained a manufacturer's duty to warn as follows:

> Ordinarily, Pennsylvania follows Section 402A[19] of the Restatement (Second) of Torts which imposes strict liability on the manufacturer of a product sold "in a

---

[18] Paragraph 23 of the Complaint contains a laundry list of other allegations. Based on the Court's review, only the allegations extrapolated here pertain to negligence, while the others relate to the defective design claim asserted in Count I of the Complaint.

[19] Restatement (Second) of Torts § 402A provides, in relevant part:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

defective condition unreasonably dangerous to the user or consumer . . . ." The product may be considered in a defective condition if it is sold without a warning of the hazards associated with its use.

742 F. Supp. 239, 251 (E.D. Pa. 1990), aff'd, 964 F. 2d 1348, 1353 (3d Cir. 1992) (citations omitted).

Under this Section, a manufacturer is liable for harm caused by a defective product. The lack of warning may be considered a defect. But there is a second rule that can apply when a product is defective for lack of warning. The District Court in Mazur explained that the rules are different for products that are "incapable of being made safe for . . . [their] intended use." Id. (quoting Incollingo v. Ewing, 444 Pa. 263, 287 (Pa. 1971)). With respect to those special products, "the standard of care required is that set forth in § 388 of the Restatement[20] dealing with the liability of a supplier of a chattel known to be dangerous for its intended use." Id. Under this section, the supplier has a duty to exercise reasonable care to inform product users of the facts

_____

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

[20] Restatement (Second) of Torts § 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

which make it likely to be dangerous.  Id. 282 at n 9; see also Baldino v. Castagna, 487 A.2d 807,

810 (Pa. 1984).

Determination whether a warning is adequate is a question of law to be decided by the

court, not a jury.  Mazur v. Merck & Co., 964 F. 2d 1348, 1366 (3d Cir. 1992) (citing Mackowick

v. Westinghouse Electricity Corp., 575 A.2d 100, 103 (Pa. 1990).  In the present case, it is unclear

which standard applies to the LOA-24 because as discussed supra, whether it could be designed

safer for its intended use is an issue for the jury to decide at trial.  An analysis under either standard,

however, depends on whether manufacturers "complied with the duty to exercise reasonable care

to inform" product users of the risks associated with their product.  Mazur, 742 F. Supp. 239, 252

(E.D. Pa. June 29, 1990), aff'd, 964 F. 2d 1348, 1353 (3d Cir. 1992) (citations omitted).

Here, Siemens Dematic met their duty to provide a reasonable and adequate warning of the

inherent dangers of the LOA-24.  Specifically, Defendants had a duty to warn of the possibility

that the LOA-24's booms would telescope by the force of gravity and injure a mechanic if they

were not anchored during maintenance through a mechanical lockout procedure.  The record

indicates that Siemens Dematic warned against this exact risk in the service manual.  The manual

clearly stated:

> Do not perform adjustments, maintenance, or other work on this equipment without
> following OSHA lock-out/tag-out requirements and state and local requirements.
> Failure to follow these requirements may result in serious injury and/or equipment
> damage.
>
> Anchor the unit booms before starting the removal procedure.  Once the boom chain
> master link is disconnected, gravity will move the unit booms if they are not
> anchored. [21]

(Doc. No. 29-7 at 18.)

---

[21]    Again, it should be noted that the manual did not contain instructions on how to mechanically
lockout the machine, which is only relevant to the design defect claim in Count I.

Importantly, Plaintiff does not dispute that this warning exists. As noted previously, in his deposition, Elgert admits that he never read the service manual, even though he the he had access to it at his UPS facility. (Doc. No. 29-5 at 42:11-14.) Flanagan v. MARTFIVE, LLC, 259 F. Supp. 3d 316, 320 (W.D. Pa. 2017) (granting summary judgment on a failure-to-warn claim pursuant to Restatement (Second) of Torts § 402A where a plaintiff testified under oath that he did not read the manufacturer's warnings).

Accordingly, as the moving party, Defendants have met their burden of showing that no genuine dispute of material fact on Plaintiff's negligence claim. They are entitled to summary judgment for this reason and also because Plaintiff has not made an opposing argument.

With respect to summary judgment, where a moving party has sustained its initial burden, the burden of producing substantial evidence to demonstrate the existence of a genuine dispute as to a material fact shifts to the opposing party. See Fed. R. Civ. P. 56 (e)(3) (stating that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it"). See also Anderson, 477 U.S. at 248 ("There is no issue at trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted"). Further, a 2010 amendment to the Advisory Committee Notes on Federal Rule of Civil Procedure 56(c)(4), which governs evidence submitted on summary judgment, states that a court may "consider a fact as undisputed for the purposes of a motion when response or reply requirements are not satisfied."

Plaintiff's only assertions regarding his negligence claim are raised in Count II of the Complaint. In effect, Plaintiff does not dispute Defendants' argument for summary judgment on

the negligence claim because he has not satisfied the requirements of responding to it in his Opposition to Defendants' Motion for Summary Judgment, filed on August 15, 2018.  To survive summary judgment, Plaintiff cannot rely solely on the allegations in his Complaint to support his claim.  Because Defendants have met their burden of showing no dispute of material fact exists, Plaintiff must present evidence to the contrary to avoid summary judgment.  Booth v. Pence, 354 F. Supp. 2d 553, 557 (E.D. Pa. 2005) ("To avoid summary judgment, the non-moving party must produce more than a 'mere scintilla' of evidence to demonstrate a genuine issue of material fact").  The record here indicates that he has not even tried to meet this burden.

For all of these reasons, summary judgment on the negligence claim in Count II of the Complaint will be granted.

V.      **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 28) will be granted in part and denied in part.  It will be granted on the negligence claim asserted in Count II of the Complaint and denied on the strict liability claims asserted in Count I.  An appropriate Order follows.