IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SEAN ELGERT,

    Plaintiff,

v.

SIEMENS INDUSTRY, INC., et al.,

    Defendants.

CIVIL ACTION
NO. 17-1985

**OPINION**

**Slomsky, J.**                                                                                                      **August 21, 2019**

## I. INTRODUCTION

Plaintiff Sean Elgert ("Plaintiff" or "Elgert") initiated this strict products liability suit after he was severely injured while repairing a conveyor machine at a UPS facility. He sued the manufacturers, producers and distributors of the machine, Defendants Siemens Industry, Inc., Siemens Postal, Parcel & Airport Logistics, LLC, and Dematic Corp. ("Defendants" or "Siemens Dematic") in the Court of Common Pleas of Philadelphia County. He alleged two claims: (1) strict liability under § 402A of the Restatement (Second) of Torts, pursuant to Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014), and (2) negligence. The case was removed to this Court based on diversity of citizenship jurisdiction.

On August 1, 2018, Defendants filed a Motion to Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety Communication and Alternative Design Opinions at Trial. (Doc. No. 29.) Plaintiff opposed the Motion (Doc. No. 31), and Defendants replied (Doc. No. 33). On March 20, 2019, the Court entered an Opinion and Order denying Defendants' Motion to Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety

1

Communication and Alternative Design Opinions at Trial, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). (Doc. Nos. 47, 48.)

Before the Court is Defendants' Motion to Reconsider the Court's Order Denying the Motion To Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety Communication and Design Defect Opinions at Trial (Doc. No. 51), Plaintiff's Response in Opposition (Doc. No. 58), and Defendants' Reply (Doc. No. 60). For reasons stated below, the Motion to Reconsider will be denied.

## II. BACKGROUND

Plaintiff was a mechanic at the United Parcel Service ("UPS") facility in Horsham, Pennsylvania. (Doc. No. 29-2.) On July 7, 2015, he was servicing a LOA-24 conveyor machine, which is a device that has three extendable and retractable sections called booms. (Id. at 3.) When the booms are fully extended, they form a conveyor belt that moves down an inclined ramp to transport pre-sorted packages. For operation and maintenance purposes, the machine can be controlled by the expansion and retraction of the boom sections. (Id.)

On the day of the incident that gave rise to this lawsuit, Elgert "locked out" the machine before he began replacing its parts, which means he disengaged all of the electrical energy sources so that the booms would not extend. (Doc. No. 31-1 at 2.) After replacing a part on the left side of the machine, he proceeded to change the corresponding part on the right side. (Id.) He put his left hand on the left side of the machine to maintain stability. (Id.) The machine unexpectedly extended by the force of gravity, despite the fact that it was electronically "locked out." In this regard, even when a machine is "locked out," parts of it are still holding what is known as stored energy due to its position relative to other objects. Four fingers on Elgert's left hand were crushed by the booms, and later amputated. (Id. at 2-3.)

2

On March 23, 2017, he sued Defendants alleging strict products liability and negligence claims due to the LOA-24's defective design. (Doc. No. 1 at 13-24.) Plaintiff proceeded on a risk-utility theory of strict liability under the Pennsylvania Supreme Court's decision in Tincher v. Omega Flex, Inc., 104 A.3d 328 (Pa. 2014). Specifically, Elgert claimed that Siemens Dematic was responsible for the defective design of the LOA-24 in accordance with the factors relevant to the risk-utility analysis set forth in Tincher. The factors are: (1) the usefulness and desirability of the product – its utility to the user and the public as a whole; (2) the safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and (7) the feasibility, on part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance. Tincher, 104 A.3d at 398.

In support of his position, Plaintiff retained Thomas Cocchiola, P.E., C.S.P.[1] to render an expert opinion. (Doc. No. 31-1 at 3.) Cocchiola is a well-qualified engineer. He has earned a Bachelor's degree in mechanical engineering from Villanova University, where he was a member of Pi Tau Sigma, an honorary mechanical engineering fraternity.[2] (Doc. No. 31-7 at 2-3.) He

---

[1] P.E. stands for "professional engineer." C.S.P. stands for "Certified Safety Professional." (See Doc. No. 31-7 at 2.)

[2] Mechanical engineering is the branch of engineering that involves the design, production and operation of machines.

3

also holds a Master's degree in Business Administration. (Id.) Additionally, he is a licensed professional engineer in New Jersey, New York and Pennsylvania. (Id.) He is a board-certified professional, and a member of the American Society of Mechanical Engineers, the National Society of Professional Engineers, the National Academy of Forensic Engineers, and the American Society of Safety Engineers. (Id.) Cocchiola served as an adjunct professor at the New Jersey Institute of Technology until 1999. (Id.) Since 1976, he has worked as a consulting engineer. (Id.)

Cocchiola prepared a written report based on inspections of the Siemens Dematic LOA-24 conveyor involved in the accident, documents produced in discovery regarding the accident, authoritative safety standards and references, and his education, professional training and experience. (Doc. No. 31-2 at 4.)

His opinion had two main conclusions. (Id.) They are: (1) the LOA-24 was defectively designed, and (2) there were feasible alternative designs that could have successfully eliminated the stored energy risk that caused Elgert's injury. (Id. at 3-28.) He concluded that Defendants should have equipped the machine with energy isolation devices to prevent the release of stored mechanical energy during maintenance and repair of the LOA-24 in accordance with American National Standard Institute ("ANSI") regulations. (Id. at 16-19.) In particular, Defendants should have provided an energy isolating device to prevent the telescoping boom sections from extending due to the force of gravity. (Id.) Additionally, he found that the machine's manual did not include a recommendation for type or location of energy isolating devices to be used to anchor the booms, despite Defendants' awareness of the hazard. (Id.)

In relevant part, he opined:

The Siemens Dematic LOA-24 was defectively designed because it lacked energy isolation devices for safely securing conveyor boom sections during maintenance

4

and repairs. Energy isolation devices were necessary for securing boom sections during maintenance in accordance with safety standards (ANSI/ASSE Z244.1) and recommendations.

The LOA-24 specifically lacked properly identified integral energy isolation devices (e.g., latch pins, vertically and horizontally stop bars, cross member latches) or non-integral energy isolation devices (e.g., safety blocks, props, clamps, and come-alongs) that would enable workers to prevent boom section movement due to the force of gravity.

Siemens Dematic should have provided energy isolation devices to restrain stored potential energy due to gravity consistent with ANSI/ASSE Z244.1.

The failure of Siemens Dematic to equip the LOA-24 with energy isolation devices unnecessarily exposed workers to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defectively designed because the lockout section in the service manual did not address hazards due to gravity and did not include information and recommendations for energy isolation devices.

The Siemens Dematic lockout section should have specifically addressed hazards due to gravity and included specific energy isolation device recommendations in accordance with ANSI/ASSE Z244.1.

Siemens Dematic failed to provide information and energy isolation device recommendations needed for the development of safe lockout procedures. The LOA-24 service manual should have included the type of instructions and recommendations for "approved" energy isolation devices that were included in Bulletin #56.

The failure of Siemens Dematic to specifically address gravity-related hazards and to provide energy isolation device recommendations unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

The Siemens Dematic LOA-24 was defective because it lacked adequate safety warnings in the service manual and on the conveyor. Siemens Dematic should have displayed a mechanical lockout warning addressing gravity (e.g., CEMA warning) in the lockout and base repair sections. Siemens Dematic should also have displayed a lockout warning addressing gravity hazards (e.g., CEMA warning) along with the electrical lockout warning next to the LOA-24 electrical disconnect switch.

5

The failure of Siemens Dematic to display safety warnings that specifically address the need to restrain gravity related hazards unnecessarily exposed UPS mechanics to a risk of injury and is inconsistent with acceptable engineering practice.

(Doc. No. 31-2 at 22-23.) Cocchiola submitted that a pin system could have been used to prevent boom section movement. (Id.) In his deposition, he stated that the pin should be L-shaped, six inches long, and three-quarter inches in diameter to adequately sustain the weight of the booms. (See Doc. No. 31-3) He said that holes in two spots on corresponding sides of the conveyor could accommodate the pins. (Id. at 6.)

On August 1, 2018, Defendant filed a Motion to Preclude Cocchiola's testimony, arguing that it is inadmissible pursuant to the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).[3]

---

[3] In Daubert, the Supreme Court noted that Federal Rule of Evidence 702 contains the standard for admitting expert testimony in federal court. 509 U.S. at 580. This rule provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is a product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Daubert Court interpreted the rule as follows:

The Rules—especially Rule 702—place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to "scientific . . . knowledge," since the adjective "scientific" implies a grounding in science's methods and procedures, while the word " knowledge" connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds. The Rule's requirement that the

By Opinion and Order dated March 20, 2019, the Court denied the Motion. (Doc. Nos. 47, 48.) It relied on the Supreme Court's decision in Daubert, and the Third Circuit's interpretation of Federal Rule of Evidence 702, which "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 369, 404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1994)). Accordingly, the Court analyzed each of the three considerations – qualification, reliability, and fit – and held that Cocchiola's testimony on both warning and instructions and design defect was admissible and relevant to the Tincher factors.

The analysis began with warning and instructions testimony. First, regarding qualification, the Court explained that "[b]ecause of his expertise in engineering, [Cocchiola] possesses the requisite broad range of knowledge, skills, and training to opine on the effect of Defendants' lack of instructions in the context of Plaintiff's defective design claim." (Doc. No. 47 at 9.) Second, the Court decided that Cocchiola's opinions are reliable because they are based on his wide-ranging practical experience as a certified engineer, a review of the record, and generally accepted principles and practices, including ANSI regulations, which is the standard governing the LOA-24. (Id. at 9-12.)

Third, the Court decided that Cocchiola's testimony would be helpful to the trier of fact because it fits the issues of the case. In relevant part, the Opinion stated:

> Whether Defendants lack of step-by-step instructions in the LOA-24 service manual is relevant to Elgert's injury is a question of fact that the jury will be presented with at trial. Cocchiola's testimony is particularly helpful to determining

---

testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

Daubert, 509 U.S. at 580-81.

7

whether the existence of suitable instructions could have increased Elgert's anticipated awareness of the dangers inherent in the LOA-24. A factfinder could conclude that step-by-step instructions on mechanical lockout that would have made the product more desirable to users. Additionally, reasonable jurors could conclude that Defendants' failure to provide instructions made the LOA-24 less safe to users, and that the existence of adequate instructions could have avoided the danger that caused Elgert's injury. Although the cost of providing instructions is unclear, reasonable jurors could find that this cost is outweighed by the probability and seriousness of harm caused by the machine.

(Id. at 12-13.)

The analysis then continued to design defect testimony, as follows:

Considering his testimony and report, Cocchiola developed a methodology to determine the alternative designs he offers. He has also provided good grounds for his beliefs in the form of explanations, drawings and mathematical calculations to demonstrate that his opinion is based on scientific facts rather than speculation and subjectivity. Accordingly, Cocchiola's alternative design opinion meets the Daubert qualification and reliability standards.

(Id. at 14.) Finally, the Court concluded that Cocchiola's design defect testimony would be helpful to the trier of fact because:

Overall, Cocchiola's report and opinion would assist the jury in determining whether the LOA-24 could have been designed in a manner that would make it more useful, desirable and safer to users. In particular, Cocchiola's testimony and written report provide relevant information on a substitute design to the LOA-24 that would meet the same need without making the machine unsafe. Moreover, it would also shed light on the manufacturer's ability to eliminate the unsafe character of the LOA-24 without impairing its usefulness or making it too expensive to maintain.

(Id. at 15.)

On April 4, 2019, Defendants filed the instant Motion to Reconsider, arguing that the Court should reconsider the admissibility of both Cocchiola's warning and instructions testimony and his design defect testimony. (Doc. No. 51.) On April 26, 2019, Plaintiff filed a Response in Opposition. (Doc. No. 58.) Defendants replied on May 6, 2019. (Doc. No. 60.) For the reasons discussed below, the Motion to Reconsider will be denied.

8

## III. STANDARD OF REVIEW

The purpose of a motion for reconsideration is "to correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). A proper motion for reconsideration "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)).

A motion for reconsideration should only address "factual and legal matters that the Court may have overlooked." In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 637, 640 (E.D. Pa. 2010) (quoting Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993)). It is improper that a motion for reconsideration ask the court to "rethink what it had already thought through—rightly or wrongly." Id. (quoting Glendon Energy Co., 836 F. Supp. at 1122). A motion for reconsideration is not a tool to present new legal theories or arguments that could have been asserted to support the first motion. Federico v. Charterers Mut. Assur. Ass'n, Ltd., 158 F. Supp. 2d 565, 578 (E.D. Pa. 2001).

Where the moving party argues that the court overlooked certain evidence or controlling decisions of law which were previously presented, a court should grant a motion for reconsideration only if the issues overlooked might reasonably have resulted in a different conclusion. Cataldo v. Moses, 361 F. Supp. 2d 420, 433 (D.N.J. 2004). Federal courts have a strong interest in the finality of judgements and therefore should grant motions for reconsideration sparingly. In re Asbestos Prods. Liab. Litig. (No. VI), 801 F. Supp. 2d 333, 334 (E.D. Pa. 2011).

9

## IV. ANALYSIS

Defendants argue that reconsideration of the Court's decision that Cocchiola's expert opinion is admissible will prevent clear error and manifest injustice. (Doc. No. 51-1.) They take issue with the Court's analysis on Cocchiola's warning and instructions testimony. Specifically, they argue that the Court relied too heavily on Pineda v. Ford Motor Company, 520 F.3d 237 (3d Cir. 2008). They contend such reliance was error because:

> Pineda, however, was different in virtually every respect from this case; specifically: 1) the Plaintiff in Pineda asserted a completely different legal theory; 2) the Plaintiff in Pineda read the Service Manual section at issue; 3) the hazard in Pineda was not known to the mechanic plaintiff nor was it commonly encountered by mechanics; 4) no communication of the hazard existed anywhere; and 5) the engineering expert could rely on post-accident hazard communications from the manufacturer that recognized and addressed the same deficiency in the Service Manual pointed out by the expert.

(Doc. No. 51-1 at 5.)

Defendants also assert that the Court should reconsider its holding on the admissibility of Cocchiola's design defect opinions because the Opinion does not apply any of the factors cited in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), or In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994). The Court will address each argument.

### A. The Differences Between Pineda and the Present Case Do Not Alter the Court's Conclusion

The factual differences between Pineda and the present case are immaterial and do not change the applicability of the Third Circuit's holding in Pineda to the conclusions reached in this case. For background, a brief discussion of Pineda v. Ford Motor Company is warranted. 520 F.3d at 237. In Pineda, the plaintiff was an automobile technician who was injured while replacing parts of a 2002 Ford Explorer. 520 F.3d at 240. He was injured when the liftgate glass, which is a part of the vehicle that he was repairing, shattered on him. Id. Pineda subsequently sued Ford

10

Motor Company, alleging (1) that the car part was defectively designed; and (2) that Ford failed to adequately warn of the dangerous condition. Id.

To satisfy his burden of proof, Pineda retained Craig D. Clauser, P.E., as an expert. Clauser opined that the liftgate glass shattered because its "design was defective in that it was only marginally able to resist fracture in its intended service and the pertinent manual and bulletins lacked adequate instructions and warnings." Id. Clauser's report noted that "[n]o improper action by Pineda caused this incident to occur." Id. at 241. At his deposition, Clauser explained that his design defect opinion was based on his comparison of warranty claims for 2002 and 2003 model year Ford Explorers. Id. Specifically, his analysis of performance reviews based on the warranty claims led him to conclude that 2002 models had a design defect related to the liftgate glass and hinges. Id. His opinion was also based on third-party opinions he found on the internet. Id.

As to his failure to warn opinion, Clauser testified that the 2002 Explorer's service manual did not provide specific step-by-step instructions for replacing the liftgate brackets and hinges and reconnecting them to the liftgate glass. Id. He further testified that the service manual failed to warn that the need for following such instructions was a safety issue. Id. Clauser admitted that, in reaching his conclusions, he did not perform any objective testing of his own. Id. at 241-42.

Ford filed a motion to exclude Clauser's testimony, claiming that under the standards of Federal Rule of Evidence 702 and Daubert, he was unqualified to provide expert testimony, and his testimony was unreliable. Id. The District Court agreed and granted Ford's motion to exclude. Id. at 242. The Third Circuit reversed the district court's decision and provided the following explanation on the standards for qualified and reliable expert testimony under Rule 702 and Daubert:

> To meet Rule 702's liberal qualification requirement, Clauser did not need to be substantively qualified in the design of automobile rear liftgates or the drafting of

11

service manual instructions. Clauser's expertise in the stresses and other forces that might cause a material such as glass to fail was more than sufficient to satisfy Rule 702's substantive qualification requirement.

Additionally, Clauser was proffered to establish that the 2002 service manual should have contained an explicit warning that following the necessary step-by-step instruction was a safety issue. Again, as an engineer, Clauser did not purport to opine on how the warning should be worded or how it should appear in order to effectively convey its message to an automobile technician. He only testified that neglecting to follow the steps of an instruction when replacing the 2002 Explorer's liftgate brackets and hinges might result in failure of the liftgate glass, and that a warning was necessary to alert a technician to the potential problem. Clauser was substantively qualified to testify on this point because a proper warning is also a solution to an engineering problem.

Therefore, we hold that Clauser should have been qualified as an expert even though he may not have been the "best qualified" expert or did not have the "specialization" that the District Court deemed necessary.

Id. at 245. The Third Circuit also found Clauser's testimony to be reliable, holding:

We find that it is reasonable for an engineer to rely upon a warning and alternative safety instruction subsequently issued by a manufacturer in forming an opinion that an earlier service manual fails to provide adequate instructions and warnings to automobile technicians.

Id. at 246.

In this case, the Court relied on Pineda for the proposition that a qualified warning and instructions expert does not need to possess specialized expertise in warnings or instructions. In pertinent part, the Court's Opinion read:

As in Pineda, Cocchiola here does not seek to propose any specific alternative language for the instructions. Rather, his opinion is limited to whether Defendants lack of instructions exposed UPS mechanics to increased risk of injury. Because of his expertise in engineering, he possesses the requisite broad range of knowledge, skills, and training to opine on the effect of Defendants' lack of instructions in the context of Plaintiff's defective design claim.

Accordingly, Cocchiola's opinion regarding instructions and warnings meets the Daubert qualification standard.

(Doc. No. 47 at 9.)

12

Thus, the factual differences between Pineda and this case that Defendants point to do not disturb the Court's reasoning in denying their Motion to Exclude Cocchiola's testimony. It is evident that in Pineda, the principle underlying Third Circuit's holding was that the requirements of the Federal Rule of Evidence 702 should be interpreted liberally when determining the admissibility of expert testimony. Applying that principle to this case, the Court liberally construed Rule 702 when determining the admissibility of Cocchiola's testimony. The factual differences between this case and Pineda are not adequate grounds for reconsideration because the Third Circuit's reasoning, supra, does not rely on any of these differences. Accordingly, the Motion to Reconsider the admissibility of Cocchiola's warning and instructions testimony will be denied.

### B. Reconsideration of the Court's Holding On the Admissibility of Cocchiola's Design Defect Opinions is Not Warranted

Because Defendants simply ask the Court to "rethink what it already thought," they offer no valid reason for the Court to reconsider its holding that Cocchiola's design defect opinions are admissible. Glendon Energy Co., 836 F. Supp. at 1122.

In particular, they argue (1) Cocchiola has pursued no reliable methodology, and (2) his opinions fail to meet the "fit" element of the Daubert test.[4] They further claim that the Court erred by not applying any factors that the Third Circuit articulated in Daubert or In re Paoli R.R. Yard

---

[4] The "fit" element of Daubert concerns whether the expert testimony will be helpful to the jury in solving the factual dispute. Daubert, 509 U.S. at 590. Importantly, Defendants raised this argument in their Motion to Preclude Plaintiff's Expert Thomas Cocchiola From Offering Any Warning, Safety Communication and Alternative Design Opinions at Trial. (Doc. No. 29 at 23-24.) In its Opinion dated March 20, 2019, the Court discussed this argument. (Doc. No. 47 at 13-15.) In the instant Motion for Reconsideration, Defendants raise the exact argument raised in their Motion to Preclude. Because the Court has already addressed it, it need not be reconsidered here.

PCB Litigation, 35 F.3d 717 (3d Cir. 1994). Moreover, they assert that application of those factors would have resulted in the exclusion of Cocchiola's opinions.

As explained, the analysis of the admissibility of expert opinions begins with the Supreme Court's decision in Daubert, which largely adopted Federal Rule of Evidence 702 as the standard for determining the admissibility of expert opinions in federal court. 509 U.S. at 579. The Third Circuit, in In re Paoli R.R. Yard PCB Litigation, articulated that Rule 702 has three requirements: qualifications, reliability, and fit. 35 F.3d at 741-43. There, the Third Circuit instructed that district courts should take into account the following factors when evaluating whether an expert's particular methodology is reliable: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. Paoli II, 35 F.3d at 742 n.8. Importantly, the Third Circuit plainly stated that these factors are not exhaustive. Id. at 742 ("We now make clear that a district court should take into account all of the factors listed . . . as well as any others that are relevant.").

In its Opinion denying the Defendants' Motion to Exclude Cocchiola's testimony, the Court considered the Paoli II factors, and determined that they were not applicable to this case. (Doc. No. 47 at 9-12.) Instead, the Court determined that Cocchiola was qualified to provide reliable expert testimony based on his extensive practical engineering experience. (Id.) The Opinion read:

> Here, Cocciola's opinion is based on his considerable practical experience as a certified engineer, a review of the record and the facts established in this case. He

14

> also takes into account the generally accepted principles and practices, including ANSI regulations, the standard governing the LOA-24. (Doc. No. 31-2 at 4.) Even though his opinion does not rely on peer-reviewed literature and generally accepted practices, it is still reliable. He does not have to develop or test alternative warnings to render an opinion that the LOA-24 service manual did not provide adequate step-by-step instructions to account for the dangers to users during a mechanical lockout. Given his practical experience, he also does not have to obtain general acceptance or peer review to provide a reliable opinion.

(Doc. No. 47 at 11-12.) Thus, Defendants argument that the Court erred by electing not to apply the Paoli II factors is misguided. The Court considered the factors in its decision and reasoned that another consideration, practical experience, was more applicable. It appears that Defendants are dissatisfied with that reasoning, and now improperly ask the Court to "rethink what it already thought." See Glendon Energy Co., 836 F. Supp. at 1122. This is not the purpose of a Motion for Reconsideration.

Accordingly, Defendants' Motion to Reconsider Cocchiola's design defect opinions will also be denied.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Reconsider (Doc. No. 51) will be denied in its entirety. An appropriate Order follows.

15